Filed 9/25/24  P. v. Patton CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D081832 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE403794) |
| ARNOLD LEE PATTON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, John M. Thompson, Judge.  Affirmed as modified.

Jeffrey S. Kross, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Paige B. Hazard and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

In a six-month period, Arnold Lee Patton caused two separate auto accidents while driving with a blood alcohol content (BAC) well over the legal

limit. The first time he hit unoccupied parked cars and injured himself severely enough to require an extended hospitalization. The second time he hit and killed a roadside worker. A jury convicted Patton of one count of second degree implied malice murder, among other charges. Patton asserts there was insufficient evidence that he was subjectively aware of the dangers of driving while intoxicated, as necessary to support the conviction. We disagree. We modify the judgment to correct a conceded clerical error in the amount the trial court imposed for the criminal conviction assessment under Government Code 70373 and affirm the judgment as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

Patton was arrested at the scene of the second accident in December 2020. The People charged him with one count each of murder (count 1—Pen. Code § 187, subd. (a));[1] gross vehicular manslaughter while intoxicated (count 2—§ 191.5, subd. (a)); driving under the influence of alcohol causing injury (count 3—Veh. Code § 23153, subd. (a)); and driving with a BAC of 0.08 or more causing injury (count 4—Veh. Code § 23153, subd. (b)). In addition, for the prior accident that occurred in July 2020, the People charged Patton with one count each of driving under the influence of alcohol (count 5—Veh. Code § 23152, subd. (a)), and driving with a BAC of 0.08 or more (count 6—Veh. Code § 23152, subd. (b)).

### I. Prosecution's Case

#### A. *License Renewal in May 2019*

A representative from the department of motor vehicles testified that Patton filled out a lost driver's license replacement form in May 2019, just

---

[1] Further unspecified statutory references are to the Penal Code.

over a year before the first accident.  Patton was given a form with several advisements, including one that read:

> "I am hereby advised that being under the influence of alcohol or drugs or both impairs the ability to safely operate a motor vehicle.  Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both.  If I drive while under the influence of alcohol or drugs or both and as a result a person is killed, I can be charged with murder."

Patton signed and dated an acknowledgement indicating he received and understood the statement.

### B.  *Accident on July 16, 2020*

The first accident occurred on July 16, 2020 on Skyline Drive.  Skyline Drive is a divided three lane road, with one lane for travel in each direction and a center median turning lane.  Cars were parked on one side of the road, in front of residential homes, and a semi-truck was stopped in the center median, preparing to load a vehicle.

Patton was driving southbound on Skyline Drive at approximately 45 miles per hour.  He swerved to the left and hit the truck in the center median.  He then swerved away from the truck and hit at least two parked cars.  His car burst into flames.  Several individuals came out of the homes nearby.  They removed Patton from his vehicle and used a hose to put out the fire.

Paramedics arrived and rendered aid to Patton.  A police officer on the scene spoke with Patton and noted that he appeared to be in a lot of pain.  His speech was slow and garbled, he had red watery eyes, and he smelled like alcohol.  The officer asked Patton if he had been drinking and Patton replied, "don't go there with me."

3

The same officer spoke with Patton again later that evening in the hospital. Patton said that he had consumed about four glasses of champagne before driving. The officer asked about a bottle of brandy found in Patton's vehicle, and Patton said that it was from his birthday a few nights before and he had not consumed any that evening. Patton said that he was driving his girlfriend home at the time of the accident. The officer noted that it did not appear as though his girlfriend was at the scene. Patton refused to provide any further information about the girlfriend and later said that he was alone when the accident occurred. He claimed the truck crashed into him. The officer attempted to conduct field sobriety tests on Patton but was unable to complete given Patton's medical condition. The officer did not arrest Patton because he was unable to obtain a BAC reading at the time, but he did subsequently refer the case to the district attorney for criminal charges.

The hospital drew blood from Patton upon his admission and conducted several tests per standard hospital protocol. A blood plasma test registered 268 mg of ethanol per decimal of plasma, which equates to a BAC between 0.17 and 0.26. An expert opined that Patton's BAC at the time of the accident would have been between 0.14 and 0.28. The attending physician concluded Patton had 10 to 12 rib fractures and a small pneumothorax—a collection of trapped air—on the left side of his chest. He remained in the hospital for several days and had to have a drainage tube placed in his chest wall to remove an accumulation of blood.

A social worker visited Patton in the hospital to provide information on substance abuse. Patton told her that he was coming from a birthday party when the accident occurred and admitted to drinking champagne but did not give an exact amount. The social worker told Patton that his BAC suggested he had about 12 drinks. She asked if he realized he was drunk and he said

4

not until he started driving. He said that it was the first time he had a drink in 16 years and had previously been in treatment for chemical dependency, but did not want to answer any further questions. She provided him with materials about alcohol abuse and treatment. She also warned him of the dangers of drinking and driving and, specifically, that he could kill someone.

### C. *Accident on December 20, 2020*

The second accident occurred on Highway 94 near Jamul Casino approximately 6 months later, on December 20, 2020.

Patton arrived at the casino just after 9:00 p.m. that evening. He lost his balance as he walked past a security guard at the entrance. The guard noted that Patton smelled of alcohol and had glossy eyes, a common sign of intoxication. He approached Patton and initiated a conversation. He asked Patton if he had been drinking, and Patton said he had a couple of drinks earlier in the day. The guard determined Patton was too intoxicated to enter the casino and asked him if anyone could give him a ride home. Patton said that he had driven himself and became confrontational with the guard. The guard offered to assist Patton with a cab or ride share service, but Patton refused. The guard was unable to leave his post, and radioed additional security team members for assistance.

The beverage supervisor for the casino arrived on the scene and likewise concluded that Patton was clearly intoxicated and increasingly agitated. He informed Patton that he would have to leave and again offered to arrange a ride for him. Patton said he was going to go downstairs and had a friend that would pick him up. Patton went down the stairs to the valet drop off and pick up area.

Two security officers followed Patton. He did not get picked up by a friend and, instead, walked through the parking garage looking for his

5

vehicle. It took Patton approximately 30 minutes to do so. One of the security guards asked him not to get into his car and once again suggested alternatives but Patton ignored the request. After steadying himself against the car and locating his keys, Patton got into the vehicle and drove out of the parking garage, towards the highway. The casino dispatcher contacted law enforcement to apprise them of the situation.

Jesus Gonzalez was working as a "flagger" at the construction site on highway 94, about 5 miles down the road from the casino. The highway was one lane in each direction and the work required closure of one of the lanes. Gonzalez and another flagger stood at opposite ends, directing traffic in a single line, alternating directions. Both wore brightly colored construction jackets with reflectors and white hardhats. They held reflective signs that said "stop" on one side and "slow" on the other and maintained communication over handheld radios. There was a mobile bank of lights positioned right next to Gonzalez and advanced warning signs were placed in both directions.

Patton approached the area around 9:45 p.m. He was swerving across the center line as he approached. The flaggers had stopped traffic in the direction Patton was heading and there was a vehicle stopped in front of him. Patton swerved to avoid that car, accelerated as he attempted to correct, hit several cones, and then hit Gonzalez with his car. Gonzalez was taken to the hospital but did not survive.

At least two police officers made contact with Patton at the scene shortly after the collision. Both noted that Patton smelled of alcohol, had red watery eyes, and was unsteady on his feet. He was highly emotional, rambling, speaking irrationally, and complaining that the worker had been in the roadway. When asked about the accident, Patton said he was driving

6

about 25 miles per hour, the roadway was dark, and he did not see any construction signs or illumination of the construction zone. As he rounded a corner in the highway, he saw a pedestrian standing in the road about 10 feet in front of him. "Then the pedestrian hit his vehicle."

Patton admitted drinking two glasses of champagne at the casino but could not say when he started or stopped drinking. One of the officers asked Patton to perform several standard tests to determine if he was driving under the influence. Patton performed poorly on each. The officer concluded Patton was under the influence of alcohol and placed him under arrest. The officer performed two breathalyzer tests on Patton at approximately 11:20 p.m. Patton's BAC registered at 0.170 and 0.169.

## II. Defense Case

Patton testified in his own defense. Patton conceded that he had a drinking problem when he was younger. He said he drank every day and was drinking two to three six-packs per week.

He admitted drinking "through" the two days leading up to the first accident in July 2020. He said that he had not realized how much he drank because he usually drank champagne and not hard liquor. He said he thought he was okay to drive and that he "felt a little tipsy" but "wasn't drunk." He "downed" a full glass on his way out the door and "felt it pretty good" about halfway through his drive. He tried to hurry up so he could get back home and that is when the accident occurred. He said he remembered speaking with the social worker in the hospital after the accident but did not recall the specifics of the conversation or the handouts she gave him.

Regarding the second accident in December, Patton said that an acquaintance asked him for a ride to the casino. There was a half of bottle of champagne sitting on his table "from a couple nights before," and he drank it

7

on his way out the door. On the way to the casino, the acquaintance took out two paper cups and a bottle of liquor and poured Patton a cup of alcohol. Patton drank the alcohol and then refilled his cup with champagne that he had in his vehicle. After he drank the champagne, his companion poured him another cup of alcohol, which he also drank. The acquaintance got out of the car about 50 yards before the casino to smoke and Patton drove on and parked near the exit of the parking garage, where it would be easy to find his car, and went inside the casino.

He slipped on his way up the stairs, and the security guard said he was too intoxicated to enter the casino. Patton again said that he was "tipsy" but "wasn't drunk." Several security guards followed him when he left the casino, so he walked around for a while, "just to give them the run-around." He knew the highway patrol would be waiting for him at the bottom of the hill and wanted to sneak back into the casino to ask his acquaintance to drive him home. He also tried to call his sister and the acquaintance, but neither answered, so he decided to leave on his own. He did not see any construction or warning signs as he approached the roadwork, but did see the cones in the road before the accident.

Patton later explained that when he said "tipsy," he meant "a high level of being intoxicated . . . a level before you get intoxicated to the fullest." To him, "tipsy" was different from "drunk" which meant "falling down, being obnoxious, causing trouble with people, throwing up all over the place, running into things." He did not normally drive while feeling tipsy because he often had his granddaughter with him. When asked if he knew it was dangerous to drink and drive, Patton said "Yeah. I had an accident." He admitted that he knew it was dangerous to drink and drive even before the accident in July, and that he tried to "hurry and get home" once he felt the

8

alcohol creeping up on him.  He knew at the time that he could have hurt or killed someone.

## III.  Verdict and Sentencing

The jury found Patton guilty on all charges, including murder.  The trial court sentenced Patton to a term of 15 years to life on the murder conviction.  The court imposed, but stayed the middle term for the remaining charges related to December 2020, and sentenced Patton to credit for time served on the misdemeanor driving under the influence charges related to July 2020.

## DISCUSSION

## I. Sufficient Evidence Supports the Murder Conviction

Patton's primary argument on appeal is that the evidence was insufficient to support the murder conviction and, specifically, that the prosecution failed to present sufficient evidence from which the jury could have found that he actually appreciated the risk of driving under the influence in December 2020.  We disagree.

### A.  *Standard of Review*

The substantial evidence standard of review is a deferential standard.  " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record,* there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681 (*Jones*).)

" 'In reviewing a challenge to the sufficiency of the evidence . . . we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is

reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215 (*Houston*).) " 'We do not reweigh evidence or reevaluate a witness's credibility.' " (*Ibid*.) We " 'presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.) " ' "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." ' " (*Ibid*.)

An appellant challenging the sufficiency of the evidence under the foregoing standards "bears an enormous burden." (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

**B.** ***Second Degree Implied Malice "Watson" Murder***

"Murder is the unlawful killing of a human being, or a fetus, with malice aforethought." (§ 187, subd. (a).) Malice may be express or implied. (§ 188; *People v. Watson* (1981) 30 Cal.3d 290, 295 (*Watson*).) All murder that does not fit within the definition of first degree murder in section 189, subdivision (a)—that is, "murder committed by specified lethal means 'or by any other kind of willful, deliberate, and premeditated killing,' or a killing which is committed in the perpetration of enumerated felonies"—is second degree murder. (*Watson, supra*, at p. 295.)

Discussing these concepts in the context of a death that occurred as the result of the defendant driving under the influence, the court in *Watson* explained that, distinct from gross negligence, "*malice* may be implied when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life." (*Watson, supra,* 30 Cal.3d at p. 296.) "Implied malice contemplates a subjective awareness of a higher

10

degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence." (*Ibid*.) Accordingly, "a finding of implied malice [necessary to support a murder conviction] depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard," and thus, "the prosecution will be required to show a higher degree of culpability in support of the second degree murder charge than it will to establish vehicular manslaughter." (*Id.* at pp. 296–297; see also *People v. Alvarez* (2019) 32 Cal.App.5th 781, 785, fn. 2 ["Implied malice murder involving drunk driving is now 'colloquially known as a *Watson* murder' "].)

The court found there was probable cause to charge the defendant in *Watson* with second degree murder based on the following facts: "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that [the] defendant was aware of the hazards of driving while intoxicated." (*Watson, supra,* 30 Cal.3d at p. 300.) "Defendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created. In combination, these facts reasonably and readily support a conclusion that [the] defendant acted wantonly and with a conscious disregard for human life." (*Id*. at p. 301.)

11

"After *Watson*, appellate courts have upheld numerous murder convictions in cases where defendants have committed homicides while driving under the influence of alcohol." (*People v. Superior Court (Chagolla)* (2024) 102 Cal.App.5th 499, 512 (*Chagolla*) [summarizing numerous cases].) "These opinions have generally relied on some or all of the factors that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*Ibid.*) At the same time, " 'courts have recognized that there is no particular formula for analysis of vehicular homicide cases, instead requiring a case-by-case approach.' " (*Chagolla, supra,* at pp. 512–513.)

## C. *Analysis*

There was ample evidence from which the jury could have concluded Patton acted with implied malice when he drove under the influence of alcohol on December 20, 2020.[2] There is no dispute that Patton was involved in two accidents in a relatively short period, and that he was under the influence of alcohol on both occasions. But Patton was aware of the dangers of drinking long before 2020. Patton testified that he had a significant drinking problem in the past and told the hospital social worker that he previously attended a chemical dependency program.

Just over a year before the first accident, Patton renewed his license and signed a form certifying that he understood that driving under the influence of alcohol "is extremely dangerous to human life," and that he could be charged with murder if a person was killed as a result. (See *People v. Wolfe* (2018) 20 Cal.App.5th 673, 683 [signature on license renewal form

---

2    The jury was appropriately instructed on the elements of murder with malice aforethought. Patton does not suggest otherwise.

evidence of defendant's knowledge of dangers of drinking and driving].) Patton asserts there was no evidence he read the advisement, but he does not dispute that he signed the document acknowledging the disclosures. Rather, Patton testified that he signed his name on the DMV forms under penalty of perjury and, notably, did not deny reading or understanding the advisements. He also stated that he knew about the laws against drinking and driving, and that the purpose of those laws was to avoid accidents because someone could get hurt. The jury was certainly entitled to infer from that evidence that Patton did read and understand the advisement in May 2019. (See *Houston, supra,* 54 Cal.4th at p. 1215.)

Thereafter, and just six months before the accident that took the life of Jesus Gonzalez, Patton had *personal experience* with the dangers of drinking and driving. He drove after two days of drinking, hit several parked cars (thankfully unoccupied at the time) and injured himself so severely that he spent over a week in the hospital. While he was there, a social worker came to speak to him about the dangers of substance abuse. She pointed out that his BAC was closer to the point of death than sober and warned him specifically about the dangers of drinking and driving. Patton was avoidant and refused to discuss the issue further, but the social worker left him with written materials detailing the impairment caused by alcohol and pointing out the potential for criminal penalties. Again, Patton suggests there was no evidence he read the materials, but regardless, the mere fact that the social worker visited his hospital room and provided materials regarding alcohol abuse shortly after the accident raises a reasonable inference that Patton was subjectively aware of the connection between his drinking, the accident, and his own injuries. It is

13

hard to imagine that under these circumstances, he was not aware of the dangers associated with continued drinking and driving.

Further still, Patton affirmatively testified that he knew it was dangerous to drink and drive. He admitted that he was feeling "tipsy" on both occasions, and testified that he normally did not drive while feeling "tipsy." He knew it was dangerous to do so even before the July 2020 accident, and certainly knew that someone could be hurt or killed after the first accident occurred. His testimony that he refrained from drinking when he had his granddaughter with him reflected his understanding of the danger to others posed by drinking and driving. Patton testified that he had not realized how much alcohol he consumed before the accident in July because he had consumed "hard liquor" for his birthday on July 19 and 20, instead of champagne, his usual beverage of choice, but despite this knowledge and recent personal experience, Patton chose to drink both champagne and hard alcohol *while in his vehicle on the way* to the casino. Then, after being turned away from the casino due to his level of intoxication and offered alternative modes of transportation, and knowing that he was "tipsy" and that the highway patrol was likely waiting for him at the bottom of the hill, Patton chose to get back in his vehicle and drive away. "Whether [Patton] was subjectively aware of the risk is best answered by the question: how could he not be?" (*People v. Moore* (2010) 187 Cal.App.4th 937, 941 (*Moore*).)

Attempting to avoid this outcome, Patton focuses on his own self-serving testimony and the factual differences that set this case apart from *Watson* and its progeny. Neither are particularly helpful. First, the existence of some evidence in contradiction to the jury's ultimate finding is of little consequence, so long as there is also evidence that supports the jury's conclusion. (See *Houston, supra,* 54 Cal.4th at p. 1215; *Jones, supra,* 18

14

Cal.4th at p. 681.)  Second, courts have consistently recognized that there is no specific formula to *Watson* murder; rather, each case must be considered on an individual basis.  (*Chagolla, supra,* 102 Cal.App.5th at pp. 512–513.) " 'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another—no more, and no less.' " (*Id.* at p. 515.)  Here, as in *Moore,* "a properly instructed jury found implied malice. Under all the circumstances, the finding is reasonable." (*Moore, supra,* 187 Cal.App.4th at p. 942.)

## II. The Judgment Must Be Amended to Correct a Criminal Conviction Assessment

Patton also contends, and the People concede, there is an error in the abstract of judgment regarding the criminal conviction assessment under Government Code section 70373 that must be corrected.

Government Code section 70373, subdivision (a)(1) provides "an assessment shall be imposed on every conviction for a criminal offense . . . in the amount of thirty dollars ($30) for each misdemeanor or felony."  Here, the trial court stated during its oral pronouncement of judgment that Patton "is ordered to pay the normal fees and costs associated with the commit."  The "normal" criminal conviction assessment, based on six felony or misdemeanor convictions, should have been $180, but the abstract of judgment reflects an assessment of $280.  The parties agree, as do we, that this was a clerical error correctable by this court.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185–186.)  Accordingly, we will amend the abstract of judgment to reflect the correct criminal conviction assessment of $180.

## DISPOSITION

We amend the abstract of judgment to reflect the correct criminal conviction assessment under Government Code section 70373 of $180 and direct the trial court to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation. As modified, the judgment is affirmed.

KELETY, J.

WE CONCUR:


DATO, Acting P. J.


BUCHANAN, J.